# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BARBARA KURZMANN : | |
| : | |
| Plaintiff : | Civil Action No. 2:21-cv-00766 |
| : | |
| v. : | |
| : | |
| HATBORO FEDERAL SAVINGS : | |
| : | |
| Defendant : | |

## BRIEF IN SUPPORT OF DEFENDANT HATBORO FEDERAL SAVINGS' MOTION FOR SUMMARY JUDGMENT

SEMANOFF ORMSBY
 GREENBERG & TORCHIA, LLC
Michael J. Torchia, Esquire
Stephen C. Goldblum, Esquire
2617 Huntingdon Pike
Huntingdon Valley, PA 19006

*Attorneys for Defendant*
*Hatboro Federal Savings*

# TABLE OF CONTENTS

I. SUMMARY OF ARGUMENT ................................................................................................1

II. FACTUAL BACKGROUND .................................................................................................1

III. LEGAL STANDARDS ..........................................................................................................2

    A. Standard For Summary Judgment For A Claim Of Unlawful Retaliation Under § 12203(a) Of The ADA ..............................................................2

    B. Standard For Summary Judgment For A Claim Of Unlawful Interference And Intimidation Under § 12203(b) Of The ADA ..................................4

IV. LEGAL ARGUMENT ...........................................................................................................5

    A. Plaintiff's Claim Of Unlawful Retaliation Under § 12203(a) Of The ADA Must Be Dismissed ...............................................................................................5

        1. No Causal Connection Exists Between Plaintiff's Complaints About the Leave Without Pay Policy and Her Termination .............................5

        2. No Evidence Exists That The Bank's Proffered Explanation For Plaintiff's Termination Was Pretext For Retailiation ...................................11

    B. Plaintiff's Claim Of Unlawful Interference And Intimidation Under § 12203(b) Of The ADA Must Be Dismissed ...........................................................14

V. CONCLUSION .....................................................................................................................16

# TABLE OF AUTHORITIES

**Cases**                                                                                                                                        **Page**

*Alifano v. Merck & Co., Inc.*, 175 F. Supp. 2d 792 (E.D. Pa. 2001) .............................................. 15

*Burch v. WDAS AM/FM*, No. CIV.A.00-4852, 2002 WL 1471703, at *1
   (E.D. Pa. June 28, 2002) .............................................................................................................. 15

*Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509 (3d Circ. 1992) ..................................... 4

*Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561 (3d Circ. 2002) .......................................................... 6

*Fuentes v. Perkasie*, 32 F.3d 759 (3d Cir. 1994) ....................................................................... 3, 4, 12

*Jalil v. Avdel Corp.*, 873 F.2d 701 (3d Circ. 1989) ........................................................................... 6

*Krouse v. American Sterilizer Co.*, 126 F.3d 494 (3d Circ. 1977) ............................................ 2, 3, 6

*Oden v. SEPTA*, 137 F. Supp. 3d 778 (E.D. Pa. 2015) ................................................................... 7, 8

*Parrotta v. PECO Energy Co.*, 363 F. Supp. 3d 577 (E.D. Pa. 2019) ................................................ 7

*Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183 (3d Circ. 2003) ............................................. 6

*Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061 (3d Circ. 1996);
   *cert. denied*, 521 U.S. 1129 (1997) .............................................................................................. 3

*Snider v. Pennsylvania DOC*, 505 F. Supp. 3d 360 (M.D. Pa. 2020) ......................................... 4, 15

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993) ........................................................................ 3

*Thomas v. Town of Hammonton*, 351 F.3d 108 (3d Cir. 2003) ........................................................ 6

*Williams v. Philadelphia Housing Auth. Police Dept.*, 380 F.3d 751 (3d Cir. 2004) ............... 6, 7, 9

*Woodson v. Scott Paper Co.*, 109 F.3d 913 (3d Cir. 1997) ...................................................... 2, 3, 6

**Statutes**

42 U.S.C. § 2000e-3(a) ....................................................................................................................... 2
42 U.S.C. § 12203(a) ...................................................................................................................... 2, 5
42 U.S.C. § 12203(b) ..................................................................................................... 4, 14, 15, 16

I.  **SUMMARY OF ARGUMENT**

The Complaint is comprised of two causes of action: Count I asserts a claim for retaliation in violation of § 12203(a) of the ADA; and Count II asserts a claim for unlawful interference and intimidation in violation of § 12203(b) of the ADA. For the reasons set forth below, summary judgment is appropriate in favor of Hatboro Federal on both causes of action.

As to Count I, Plaintiff fails to meet her prima facie case because no causal connection exists between her termination and her complaints regarding the Bank's Leave Without Pay policy, which began years prior to her termination. Moreover, in the event Plaintiff makes out a prima facie case, she has failed to meet her burden to demonstrate that the Bank's reason for her termination was pretext, and was actually based upon a retaliatory motive.

As to Count II, in a July 2016 meeting with Plaintiff, Linda Roehner, the Bank's President/CEO purportedly interfered with Plaintiff's right to an accommodation in the form of time off to undergo a medical procedure. Plaintiff's claim fails, however, because during that meeting she did not request an accommodation or time off, and was only speaking hypothetically. Absent Plaintiff's exercise of a protected right, there can be no interference or coercion.

II. **FACTUAL BACKGROUND**

In conjunction with the filing of its Motion for Summary Judgment, Hatboro Federal filed a Statement of Undisputed Material Facts (**"SUMF"**) , and accompanying exhibits A through W, which are incorporated by reference.

{02362475;v1 }  1

### III. <u>LEGAL STANDARDS</u>

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a party may move for summary judgment on any claim or defense, and the court shall grant summary judgment if the movant shows there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.

> **A.  Standard For Summary Judgment For A Claim Of Unlawful Retaliation Under § 12203(a) Of The ADA**

The ADA retaliation provision, 42 U.S.C. § 12203(a), states "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge . . . under [the ADA]." In *Krouse v. American Sterilizer Co.*, 126 F.3d 494 (3d Cir. 1997), the Third Circuit set forth the framework for deciding a claim of unlawful retaliation under the ADA:

> This provision is similar to Title VII's prohibition of retaliation. See 42 U.S.C. § 2000e–3(a). Accordingly, we analyze ADA retaliation claims under the same framework we employ for retaliation claims arising under Title VII. (citations omitted).
>
> \* \* \*
>
> We begin, as all "pretext" cases begin, with the prima facie case. To establish a prima facie case of retaliation under the ADA, a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action. (citations omitted).
>
> If an employee establishes a prima facie case of retaliation under the ADA, the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its adverse employment action. *Woodson*, 109 F.3d at 920 n. 2. The employer's burden at this stage is "relatively light: it is satisfied if the defendant articulates any legitimate reason for the [adverse employment action]; the defendant need not prove that the articulated reason actually motivated the [action]."

> If the employer satisfies its burden, the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action. *Id.*; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519, 113 S.Ct. 2742, 2753–54, (1993) ("It is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.") (emphasis omitted); *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1067–68 (3d Cir. 1996) (en banc) (explaining how plaintiff may satisfy burden), *cert. denied*, 521 U.S. 1129, 117 S.Ct. 2532, 138 L.Ed.2d 1031 (1997). The plaintiff must prove that retaliatory animus played a role in the employer's decision-making process and that it had a determinative effect on the outcome of that process. *Woodson*, 109 F.3d at 931–35 (discussing proper standard to apply in Title VII retaliation case). The burden of proof remains at all times with the plaintiff. *Id.* at 920 n. 2.

*Krouse*, 126 F.3d at 500-01.

This basic framework under Title VII illustrates that, to defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *Fuentes v. Perkasie*, 32 F.3d 759, 764 (3d Cir. 1994).

A plaintiff who has made out a prima facie case may defeat a motion for summary judgment by either (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action. *Id.*

To discredit the employer's proffered reason the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether

discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. *Id.* at 765; *See Ezold v. Wolf, Block, Schorr & Solis–Cohen*, 983 F.2d 509, 533 (3d Cir. 1992). Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence" and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons." *Id.*; *Ezold*, 983 F.2d at 531

### B. Standard For Summary Judgment For A Claim Of Unlawful Interference and Intimidation Under § 12203(b) Of The ADA

42 U.S.C. § 12203(b) states, "It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter." In other words, § 12203(b) prohibits coercion, intimidation, threats, and interference with an individual in the exercise of her own rights under the ADA or because she aided or encouraged any other individual to exercise her rights under the ADA.

To state a claim under § 12203(b), a plaintiff must allege "when the defendant 'coerced,' 'threatened,' 'intimidated,' or 'interfered,' the plaintiff was exercising or enjoying a right protected by the [ADA]." *Snider v. Pennsylvania DOC*, 505 F. Supp. 3d 360, 399 (M.D. Pa. 2020). Further, "[a]lthough there is little jurisprudence interpreting this provision, '[t]he language of the statute and what case law there is . . . make clear that to establish a violation of § 12203 plaintiffs must show that when the coercion took place they were exercising or enjoying a right protected by the [ADA].'" *Id.* "

## IV. LEGAL ARGUMENT

### A. Plaintiff's Claim Of Unlawful Retaliation Under § 12203(a) Of The ADA Must Be Dismissed

Count I of the Complaint asserts a claim for retaliation in violation of § 12203(a) of the ADA. Plaintiff alleges she was discharged in retaliation for her good faith complaints about Defendant's Leave Without Pay policy to Ms. Roehner, Mr. Douglass, Ms. Rush and Mr. Jarrett in the days immediately preceding her termination in August 2016.

This claim fails, however, because (1) Plaintiff cannot demonstrate a prima facie case of retaliation under the ADA because no causal connection exists between Plaintiff's protected activity and the employer's adverse action; and (2) Plaintiff has adduced no evidence that the Bank's proffered explanation for Plaintiff's termination was false, and was in fact pretext for retaliation.

#### 1. No Causal Connection Exists Between Plaintiff's Complaints about the Leave Without Pay Policy and Her Termination

Plaintiff claims she was terminated in retaliation for complaining about Defendant's Leave Without Pay policy to Ms. Roehner, Mr. Douglas, Ms. Rush and Mr. Jarrett. She claims her discharge on August 17, 2016 was "within days" of complaining about Defendant's Leave Without Pay between August 12 and 17, 2016. *See* Compl. ¶¶ 25-30. By Plaintiff's own admission, however, she began complaining to Ms. Roehner about the Leave Without Pay policy in 2014, years before she was terminated. Because no causal connection exists between her complaints and her termination, Plaintiff cannot make out a prima facie case of retaliation.

To establish a prima facie case of retaliation under the ADA, a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's

protected activity and the employer's adverse action. *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997); *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567–68 (3d Cir. 2002).

In the ADA retaliation context, temporal proximity between the protected activity and the termination can itself be sufficient to establish a causal link. *See Williams v. Philadelphia Housing Auth. Police Dept.*, 380 F.3d 751, 760 (3d Cir. 2004); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997). However, "the timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred." *Id.* (citations omitted).

For example, in *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989), two days between the protected activity engaged in and the alleged retaliation sufficed to support an inference of a causal connection between the two. Similarly, comments made by a supervisor suggesting retaliation ten days before termination, along with other evidence of retaliation, were sufficient to establish a prima facie showing of causation. *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003).

In a case "where 'the temporal proximity is not so close as to be unduly suggestive," the Third Circuit has recognized that "timing plus other evidence may be an appropriate test." *Id.* (citing *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003).

In *Krouse*, nineteen months passed between the time Krouse filed his EEOC charge and the time his employer purportedly retaliated against him by placing him on workers' compensation leave. *Krouse*, 126 F.3d at 503. Because Krouse failed to proffer any evidence establishing a causal connection between his EEOC charge and the decision to place him on workers' compensation leave, the Third Circuit affirmed the District Court's grant of summary judgment on Krouse's retaliation claim. *Id.* at 503-04.

In *Williams v. Philadelphia Housing Auth. Police Dept.*, the Third Circuit affirmed the District Court's determination that a period of two months between the time Williams requested a radio room assignment and the time that he was terminated was insufficient to show a causal connection absent some other evidence of discrimination. *Williams*, 380 F.3d at 760-61. Further, Williams put forth no evidence suggesting that PHA terminated him because he requested a radio room assignment and the evidence supporting PHA's alternative explanation was "quite compelling" because Williams acknowledged that PHA had granted him medical leave on two prior occasions, and there was no indication that PHA would not have done so again. *Id.* Because Williams failed to proffer any evidence of retaliation other than the not unduly suggestive temporal relationship between his request for an accommodation and his termination, the Third Circuit affirmed the District Court's grant of summary in PHA's favor as to Williams' ADA retaliation claim. *Id.*

In *Parrotta v, PECO Energy Co.*, 363 F. Supp. 3d 577 (E.D. Pa. 2019), an employee with a foot condition brought action against former employer alleging, among other causes of action, retaliation under the ADA. Employee alleged his most recent protected activity under the Act occurred more than eight months before his termination, and failed to show an unusually suggestive temporal proximity between his protected activity and his termination. *Id.* at 602. The district court determined employee failed to establish a genuine issue of fact as to a causal connection between the alleged protected activity and his termination. *Id.*

In *Oden v. SEPTA*, 137 F. Supp. 3d 778 (E.D. Pa. 2015), a former employee brought an action against SEPTA for claims including retaliation in violation of the ADA. SEPTA conceded Oden engaged in a protected employee activity, but challenged Oden's ability to show a causal connection between her protected activity and her ultimate termination. SEPTA argued Oden

could not sufficiently connect her July 2011 requests for accommodation and her termination fourteen months later. The court agreed and concluded since Oden lacks unusually suggestive temporal proximity, as well as a pattern of antagonism directed at her, she failed to show a causal connection between her requests for a reasonable accommodation and her February 2013 termination. *Id.* at 792.

Here, the temporal proximity of Plaintiff complaining about the Leave Without Pay policy and her termination is not so close as to be unduly suggestive. Plaintiff first began questioning Ms. Roehner regarding the Leave Without Pay policy in 2014 – years prior to her termination on August 17, 2016. Plaintiff testified:

> Q. My question is, why do you think the bank singled you out?
>
> A. I think the bank singled me out because I kept questioning this policy about no pay time.
>
> Q. When is the first time you ever questioned that policy?
>
> A. Years ago. It all started I think like '14 when Linda took over.
>
> Q. You're telling me in 2014 you questioned that policy, the paid time off policy?
>
> A. When I had to ask for extra time off, I never had a problem with the former president.
>
> Q. That's okay
>
> A. And then I started questioning it, yes.

(SUMF ¶ 41).

Additionally, as early as 2014 and 2015, Plaintiff was warned regarding exceeding her allotted paid time off in her annual performance evaluations, which pre-dated by years her alleged complaints regarding the purportedly "illegal and discriminatory" leave policy in August

2016 that she claims led to her termination on August 17, 2016. (SUMF ¶ 31-32). Plaintiff's annual performance reviews dated November 5, 2014 and November 13, 2015 note attendance issues and poor management of vacation and sick time. (*Id.*).

Further, like the plaintiff in *Williams,* the Bank had granted Plaintiff medical leave on numerous prior occasions, and there was no indication that the Bank would not have done so again. Plaintiff was given extra time off by the bank beginning in 2012 for medical procedures relating to potential breast cancer and breast reconstruction (SUMF ¶ 33). From 2012 through 2016 Plaintiff "pretty consistently" experienced serious medical conditions and Plaintiff had at least three surgeries and a reconstruction including in June, July and September 2015 and January and February 2016. (SUMF ¶ 34).

Although plaintiff regularly violated the Leave Without Pay by exceeding her allotted PTO/vacation, and entered a "no pay" status, she never received any discipline whatsoever for doing so. (SUMF ¶ 29). For example, Plaintiff exceeded her allotted paid time off and entered a "no pay" status in 2010, 2011, 2012 and 2014 and was not disciplined in any of those years for doing so. (SUMF ¶ 30).[1] In fact, in 2014, in addition to Plaintiff, ten other employees took "no pay" days and suffered no discipline for doing so. (SUMF ¶ 36). There is no indication whatsoever beyond Plaintiff's own subjective belief that she would have been disciplined for taking time off in 2016 in the event she needed additional time off for a medical procedure.

---

[1] This is consistent with all Bank employees. For example, Mary Hood, the Bank's former Teller Supervisor, exceeded her allotted paid time off and entered a "no pay" status in 2009, 2010, 2011, 2012, 2013, 2014 and 2015 and was not disciplined in any of those years for doing so. (SUMF ¶ 35). In fact, although she worked for Hatboro Federal for approximately 18 years, Plaintiff could not identify a single person that was ever terminated for violating the Leave Without Pay policy. (SUMF ¶ 37). Similarly, Ms. Hood worked for Hatboro Federal for approximately 27 years, and she could not identify anyone that was ever terminated for violating the Leave Without Pay policy. (SUMF ¶ 38).

Plaintiff contends that she was "singled out" by Ms. Roehner regarding her attendance and potential violations of the Leave Without Pay policy. To the contrary, Plaintiff was neither "singled out" nor treated differently than any other Bank employee in this regard.[2]

The Leave Without Pay policy states,

> ***Leave Without Pay***
> Leave without pay is subject to approval by the President. It is only granted in extraordinary circumstances. Please note that if any employee reaches a "no-pay" status and takes "no-pay" days off during the calendar year, without written permission of the President, disciplinary action up to and including immediate termination may be taken.

(SUMF ¶ 16).

Nothing on the face of the Leave Without Pay policy is discriminatory and the policy does not state if an employee reaches a "no-pay" status and takes "no-pay" days off during the calendar year, the employee will be fired, as Plaintiff has alleged. (SUMF ¶¶ 16, 23).[3] There is nothing illegal nor discriminatory about the policy, which is contained in virtually every employee handbook and merely states that if an employee exhausts all of her allotted paid time

---

[2] The Bank's Handbook contains an Equal Employment Opportunity policy that states, "Hatboro Federal is an equal opportunity employer. We will extend equal opportunity to all individuals without regard to race, religion, color, sex, pregnancy, national origin, disability, age, genetic information, military service, familial status, ancestry, sexual orientation or any other status protected under applicable federal, state or local law. Our policy reflects and affirms Hatboro Federal's commitment to the principles of fair employment and the elimination of all discriminatory practices. This policy applies to all terms and conditions of employment, including but not limited to, hiring, placement, promotion, termination, and transfer, leaves of absence, benefits, compensation and training. All decisions regarding conditions of employment are based on the individual's overall qualifications and his/her ability to perform the essential functions of the position, with or without reasonable accommodations." (SUMF ¶ 10).

[3] In addition to the Leave Without Pay policy, the Bank's Employee Handbook has a section titled "Americans with Disabilities Act" that specifically provides for reasonable accommodations (and states "Qualified applicants or employees who are disabled should request a reasonable accommodation from their supervisor or Human Resources." (SUMF ¶ 11). All employees, including Plaintiff, acknowledge on an annual basis that they have read and understood the Employee Handbook, and Plaintiff further acknowledged she was aware of the ADA policy and understood it governed medical accommodations. (SUMF ¶¶ 12, 13). Plaintiff concedes she failed to follow the ADA policy in July 2016 as set forth in the Employee Handbook by failing to request a reasonable accommodation from her supervisor or the Human Resources department. (SUMF ¶ 15).

off in a year, and then takes additional time off without approval of the President, the employee may be disciplined up to and including termination. (*Id.*)

As further evidence that Plaintiff was not "singled out" as she alleges, Christine Heiser, Director of Human Resources, prepares an "attendance report" each month for every employee at the Bank that includes how many days off each employee has taken in that month and the remaining balance of their available paid time off. (SUMF ¶ 24). Further, Ms. Heiser regularly sends all Bank employees warnings when they approach a no pay status and many such warning letters are part of the record. (SUMF ¶ 25). These notices are sent by Ms. Heiser as part of her human resources job responsibilities, and are not directed by Ms. Roehner. (SUMF ¶ 26). For example, on July 22, 2016 Plaintiff received an email from Ms. Heiser (not Ms. Roehner) stating that she had utilized all of her PTO for 2016 and had reached a "no pay" status; and on June 19, 2015 Plaintiff received a memorandum from her supervisor, Ms. Rush, stating she had used all her allotted sick days for the year. (SUMF ¶ 27).

There is simply no causal connection that exists between Plaintiff's complaints about the Leave Without Pay Policy beginning in 2014 and her termination in August 2017; and no evidence of record to demonstrate that Plaintiff was singled out by Ms. Roehner or treated differently than any other Bank employee with regard to warnings about her attendance or potential violations of the Leave Without Pay policy.

        2.    **No Evidence Exists That the Bank's Proffered Explanation for Plaintiff's Termination was Pretext for Retaliation**

Assuming Plaintiff can establish a prima facie retaliation case, Hatboro Federal satisfies its burden of production by "introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision."

*Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). The employer's burden to prove a legitimate, nondiscriminatory reason is relatively light, but the reason must be articulated. *Id.* If the employer satisfies the burden, the burden shifts to the plaintiff to prove, by a preponderance of the evidence, the employer's explanation is pretext for discrimination. *Id.*

As Branch Manager, Plaintiff was an at-will employee and executed a "Hatboro Federal Savings At-Will Acknowledgment" on January 29, 2014. (SUMF ¶ 48). On August 12, 2016, Plaintiff received a Memorandum from Mr. Douglass and Ms. Rush, the subject of which was "Conduct Probation" (**"Probation Memorandum"**). (SUMF ¶ 50). The Probation Memorandum details management's dissatisfaction with Plaintiff's work performance and attached to the Probation Memorandum is a four page attachment that details 31 different errors and issues involving Plaintiff from November 2014 through August 2016. (SUMF ¶¶ 53-54). Bank employees other than Plaintiff have regularly been placed on conduct probation; during Mr. Douglass' tenure as COO, he estimated he was personally involved in placing "easily five to ten" employees on conduct probation. (SUMF ¶ 52). The record contains many examples of bank employees other than Plaintiff being placed on probation. (*Id.*).

Notwithstanding the extensive list of errors made by Plaintiff, the Bank did not seek to terminate Plaintiff at that time, but instead desired to place her on a 90-day probation and provided a plan for her to be retrained at the Hatboro branch and then returned to her Branch Manager position in the Warminster branch. (SUMF ¶¶ 55-56). It is not in dispute that the Bank is within its rights to transfer an employee, including Plaintiff, to another branch for retraining. (SUMF ¶ 59).

The Probation Memorandum was presented to Plaintiff at a meeting on August 12, 2016 and during the meeting Plaintiff was specifically informed that it was not the Bank's intention to

terminate her, but instead to retrain her at the Hatboro branch and, if she demonstrated improved performance, she would resume her duties as the Branch Manager of the Warminster branch. (SUMF ¶¶ 57-58).

On August 16, 2016, Plaintiff's first day of reporting to the Hatboro branch and the fourth day of Plaintiff's 90-day probation, Ms. Rush informed Ms. Roehner and Mr. Douglass that Plaintiff was not performing the duties asked of her. (SUMF ¶ 66). The same day, Frank Jarett, a member of Hatboro Federal's board of directors contacted Ms. Roehner to inform her of an incident that had occurred involving Plaintiff. (SUMF ¶ 67).

Mr. Jarrett was in a local business in Hatboro on business unrelated to the Bank when he had an interaction with Plaintiff. (SUMF ¶ 68). At the direction of Ms. Roehner, Mr. Jarrett made a written statement regarding the encounter with Plaintiff. (SUMF ¶ 69). The written statement describes the encounter between Mr. Jarrett and Plaintiff in a local used car dealership office on August 16, 2016 as follows:

> All of a sudden Barb starts saying how bad things are at the bank (Hat Fed) and how everybody is unhappy and "I could ask anyone." She said people are being "bullied" and she disparaged the bank in a very demonstrative way. William [a car dealership employee] sat there and heard it all but had no response. She left and shortly thereafter I left.

(*Id.*).

As a result of what Mr. Jarrett communicated was the substance of the interaction between he and Plaintiff, on August 17, 2016, Ms. Roehner and Mr. Douglass had a meeting with Plaintiff to discuss her encounter with Mr. Jarrett. (SUMF ¶ 72). Prior to the meeting, it was not the Bank's intention to terminate Plaintiff, but to have a discussion with Plaintiff regarding how the encounter with Mr. Jarrett was handled. (SUMF ¶ 73).

At that meeting, Ms. Roehner and Mr. Douglass believed Plaintiff stated that she did not believe her actions were in any way inappropriate and that she was she was free to speak her views about the bank wherever and in whatever manner she deemed appropriate, including in public, at local businesses, and in her capacity as a member of the Warminster Chamber of Commerce. (SUMF ¶ 74). At the meeting, Plaintiff stated to Ms. Roehner and Mr. Douglass, "anybody can bad-mouth in any public place if they want to." (SUMF ¶ 75). After giving Plaintiff what Ms. Roehner perceived were several opportunities to recant this position, and Plaintiff's refusal to do so, Ms. Roehner terminated Plaintiff. (SUMF ¶ 76).

By the foregoing, the Bank has satisfied its burden of demonstrating a legitimate non-retaliatory reason for Plaintiff's termination, and the burden shifts to Plaintiff to prove that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the Bank's action. Here, no evidence exists in the record beyond Plaintiff's subjective belief which show weaknesses or implausibilities in the Bank's proffered legitimate reasons for its action. No evidence exists that a reasonable factfinder could rationally determine the Bank's stated reasons for terminating Plaintiff are unworthy of credence and hence infer that the Bank did not act for the asserted non-discriminatory reasons.

Because Plaintiff has failed to make out her prima facie case, and is unable to demonstrate the Bank's reason for her termination was pretext for discrimination, Plaintiff's claim for retaliation in violation of § 12203(b) fails.

**B.      Plaintiff's Claim Of Unlawful Interference and Intimidation Under § 12203(b) Of The ADA Must Be Dismissed**

Count II of the Complaint asserts a claim for unlawful interference and intimidation in violation of § 12203(b) of the ADA. Plaintiff alleges Ms. Roehner interfered with or intimidated her in her exercise of rights protected by the ADA during a meeting in July 2016. This claim

fails, however, because Plaintiff concedes she was not exercising rights under the ADA and did not forfeit any protections under the ADA.

To demonstrate a violation of § 12203(b) plaintiffs must show that when the coercion took place they were exercising or enjoying a right protected by the [ADA]. *See Snider v. Pennsylvania DOC*, 505 F. Supp. 3d 360, 399 (M.D. Pa. 2020).

In *Burch v. WDAS AM/FM,* No.CIV.A.00–4852, 2002 WL 1471703, at *9 (E.D. Pa. June 28, 2002), plaintiff alleged his employer had interfered with his leave rights under the FMLA to care for his ailing wife. The district court granted summary judgment in the employer's favor because plaintiff was never denied leave. Rather, employee contended that his supervisor interfered with his FMLA rights by not responding promptly to plaintiff's e-mail in which he indicated that he would be taking some time off to be with his wife and by reminding plaintiff of overdue reports during the period when employee's wife was ill. *Id.*

The court determined no competent evidence existed that the supervisor was aware that plaintiff wanted to take leave. There was nothing in the wording of plaintiff's e-mail that called for a formal response. *Id.* That the supervisor may have periodically reminded plaintiff about overdue reports and other matters required of him in the ordinary course of his job is not prohibited conduct. *Id. See Alifano v. Merck & Co., Inc.,* 175 F .Supp. 2d 792 (E.D. Pa. 2001) (FMLA interference claims require that the alleged interference cause the employee to forfeit FMLA protections).

Here, in or around July 2016, after having an ultrasound of her breasts, Plaintiff met with Ms. Roehner to discuss the possibility that she may need to take time off in the future, "I told her I may have to ask her for a leave of absence if my biopsy comes back where I need to have

another surgery." (SUMF ¶ 43). Plaintiff did not, however, make a request for time off. (SUMF ¶ 45).

Plaintiff testified,

> Q. Well, in July of '16 when you went to Ms. Roehner, did you say that you needed to undergo surgery in August of '16?
>
> R. No, I said if I need surgery to have it removed.

(SUMF ¶ 44).

Because she was uncertain whether she would need surgery, the meeting was not to formally request time off, but instead for Plaintiff to "put her ducks in a row" and give Ms. Roehner "a heads up." (SUMF ¶ 46). As of the date of Plaintiff's deposition on August 2, 2021 (more than five years later), Plaintiff still had not undergone the procedure she purportedly discussed with Ms. Roehner. (SUMF ¶ 47).

In this instance, Plaintiff did not make a request for time off and did not exercise a statutorily protected right under the ADA. Moreover, she was not denied a right because none was requested. According to Plaintiff's own testimony, she did not know if she would need time off and none was requested of Ms. Roehner. Plaintiff was merely giving Ms. Roehner a "heads up" and was not requesting an accommodation for a medical condition in the form of additional time off. Because no statutorily protected rights were sought nor forfeited, Plaintiff's claim for unlawful interference and intimidation in violation of § 12203(b) fails.

## V.  CONCLUSION

Based upon the foregoing, summary judgment is warranted on behalf of Hatboro Federal, and the Complaint must be dismissed in its entirety, with prejudice.

Respectfully submitted,

SEMANOFF ORMSBY
 GREENBERG & TORCHIA, LLC


By: ___/s/ Stephen C. Goldblum___
    MICHAEL J. TORCHIA, ESQUIRE
    STEPHEN C. GOLDBLUM, ESQUIRE
    2617 Huntingdon Pike
    Huntingdon Valley, PA  19006
    (215) 887-0200
    sgoldblum@sogtlaw.com

*Attorneys for Defendant*
*Hatboro Federal Savings*