UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BARBARA KURZMANN<br><br>        Plaintiff<br><br>        v.<br><br>HATBORO FEDERAL SAVINGS<br><br>        Defendant | :<br>:<br>:<br>:   Civil Action No. 2:21-cv-00766<br>:<br>:<br>:<br>:<br>:<br>: |

**DEFENDANT HATBORO FEDERAL SAVINGS'
STATEMENT OF UNDISPUTED MATERIAL FACTS**

Defendant, Hatboro Federal Savings, by its attorneys Semanoff Ormsby Greenberg & Torchia, LLC, files this Statement of Undisputed Material Facts in support of its Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[1]

**I.    GENERAL BACKGROUND**

    **A.    The Parties**

    1.    Hatboro Federal Savings (**"Hatboro Federal"** or the **"Bank"**) is a community bank headquartered in Hatboro, Pennsylvania with four branches: Hatboro, Warminster, Warrington and Jamison, PA. (Dkt. Entry 1, Compl. ¶ 2).

    2.    Plaintiff Barbara Kurzmann (**"Plaintiff"**) was initially hired by Hatboro Federal in 1998 as a Teller in its Hatboro branch. (Dkt. Entry 1, Compl. ¶ 5).

---

[1] This Statement of Undisputed Material Facts contains facts that are undisputed by the record evidence in this case. Defendant accepts these facts as true for the purposes of its Motion for Summary Judgment only.

3.  Plaintiff was promoted to Branch Manager of the Warminster branch in 2007. (Pl. Dep. 9:24-10:10; Dkt. Entry 1, Compl. ¶ 5).[2]

4.  As Branch Manager, Plaintiff reported to Suzanne Rush, Branch Coordinator; and John Douglass, Vice President, Chief Operating Officer (Ex. A, Pl. Dep. 10:11-14; John Douglass Dep. 10:11-10:17; 18:7-10).[3]

5.  Linda Roehner has worked for the Bank since 1979 and was named the Bank's interim President in June 2014; She was subsequently elected President/CEO by the Bank's Board of Directors in January 2015. (Linda Roehner Dep. at 11:7-10, 15:11-21).[4]

6.  Plaintiff held the position of Branch Manager of Hatboro Federal's Warminster branch until her termination by Ms. Roehner on August 17, 2016. (Dkt. Entry 1, Compl. ¶ 18; Ex. C, Linda Roehner Dep. at 17:20-22; Ex. A, Pl. Dep. at 9:8-15; Ex. B, John Douglass Dep. 13:9-14).

B.  **Relevant Policies**

7.  At all relevant times the Bank had an Employee Handbook that sets forth the Bank's workplace policies, which is reviewed by the Bank on an annual basis. (Ex. C, Linda Roehner Dep. 91:2-91:9).

8.  On an annual basis all Bank's employees must certify they have received and reviewed the Handbook. (Ex. A, Pl. Dep. 16:1-17:14).

9.  At the time of Plaintiff's termination, the Employee Handbook in effect was the version effective January 1, 2016 (the "**Handbook**"). (Def. 0267-0288).[5]

---

[2] The cited pages of Plaintiff's deposition transcript are collectively attached to the Exhibit List as **Exhibit A**.
[3] The cited pages of John Douglass' deposition transcript are collectively attached to the Exhibit List as **Exhibit B**.
[4] The cited pages of Linda Roehner's deposition transcript are collectively attached to the Exhibit List as **Exhibit C**.

{02362326;v1 }                          2

  10. The Handbook contains an Equal Employment Opportunity policy that states,

> Hatboro Federal is an equal opportunity employer. We will extend equal opportunity to all individuals without regard to race, religion, color, sex, pregnancy, national origin, disability, age, genetic information, military service, familial status, ancestry, sexual orientation or any other status protected under applicable federal, state or local law. Our policy reflects and affirms Hatboro Federal's commitment to the principles of fair employment and the elimination of all discriminatory practices. This policy applies to all terms and conditions of employment, including but not limited to, hiring, placement, promotion, termination, and transfer, leaves of absence, benefits, compensation and training.
>
> All decisions regarding conditions of employment are based on the individual's overall qualifications and his/her ability to perform the essential functions of the position, with or without reasonable accommodations.

(Ex .D, Def. 0273).

  11. The Handbook contains an Americans with Disabilities Act policy that states,

> The federal Americans with Disabilities Act (ADA) prohibits discrimination against qualified individuals with disabilities in job application procedures, hiring, firing, advancement, compensation, fringe benefits, job training and other terms, conditions and privileges of employment. The ADA does not alter Hatboro Federal's right to hire the best-qualified applicant, but it does prohibit discrimination against a qualified applicant or employee because of his or her disability, or because of a perceived disability. Hatboro Federal prohibits discrimination against people with disabilities.
>
> <u>Disabled</u> – An applicant or employee is considered disabled if he or she (1) actually has a physical or mental impairment that substantially limits one or more major life activities, (2) has a record or history of such an impairment or (3) is regarded or perceived (correctly or incorrectly) as having such impairment.
>
> <u>Qualified Individual</u> – is an individual who satisfies the skill, experience, education, and other job-related requirements of the position held or desired, and who, with or without reasonable

---

[5] The Handbook is attached to the Exhibit List as **Exhibit D**.

> accommodation, can perform the essential functions of that position.
>
> Reasonable Accommodation – A reasonable accommodation is any change in the work environment to help a person with a disability apply for a job, perform the duties of a job, or enjoy the benefits and privileges of employment. Qualified applicants or employees who are disabled should request a reasonable accommodation from their supervisor or the Human Resources Department in order to allow them to perform a particular job.

(Ex. D, Def. 0278-279).

12. Plaintiff received the Handbook, and on January 5, 2016, signed a Certification in which she acknowledged that that she had received, read and understood the Handbook and that she understands she is responsible for abiding by its provisions. (Ex. A, Pl. Dep. 16:21-17:14).

13. During her employment, Plaintiff read the ADA policy contained in the Employee Handbook and understood that it governs medical accommodations. (Ex. A, Pl. Dep. 33:24-34:5; 66:4-7).

14. If a Hatboro Federal employee requires time off for medical treatment or surgery, it falls under the ADA provisions of the Employee Handbook. (Christine Heiser Dep. 34:6-13; Ex. C, Linda Roehner Dep. 80:8-15).[6]

15. Plaintiff failed to follow the ADA policy set forth in the Employee Handbook by failing to request a reasonable accommodation from her supervisor or the Human Resources department. (Ex. D, Def. 0278-279; Ex. A, Pl. Dep. 34:23-36:3).

16. The Handbook has policies that govern Holidays, Vacation and Other Leave, which states in pertinent part,

---

[6] The cited pages of Christine Heiser's deposition transcript are collectively attached to the Exhibit List as **Exhibit E**.

{02362326;v1 }   4

Full-time staff earn vacation time based upon years of employment as follows:

| | |
|---|---|
| 1st Year to 5th Year | Ten (10) Vacation Days |
| 6th Year | Eleven (11) Vacation Days |
| 7th Year | Twelve (12) Vacation Days |
| 8th Year | Thirteen (13) Vacation Days |
| 9th Year | Fourteen (14) Vacation Days |
| 10th Year to 19th Year | Fifteen (15) Vacation Days |
| 20th Year or more | Twenty (20) Vacation Days |

\* \* \* \*

*Paid Time-Off*

Hatboro Federal provides Paid Time-Off (PTO) for all full-time employees. PTO may be used for the following:

- Medical and dental appointments for yourself or family members;
- Your personal illness or that of a member of your family; or
- Personal business that cannot be tended to outside of work hours.

You are not required to give any specific reason for using your PTO, however, when you do take PTO you should give your immediate supervisor as much advance notice as possible.

Full-time employees will receive five (5) days of PTO each calendar year to be used in no less than half day increments. You may carry over PTO from year to year and accumulate a maximum of 10 PTO days. Employees are not entitled to payment for any unused PTO days.

\* \* \* \*

*Leave Without Pay*
Leave without pay is subject to approval by the President. It is only granted in extraordinary circumstances. Please note that if any employee reaches a "no-pay" status and takes "no-pay" days off during the calendar year, without written permission of the President, disciplinary action up to and including immediate termination may be taken.

(Ex. D, Def. 0283-285).

{02362326;v1 }   5

17. The Bank has a Whistleblower Policy. (Def. 309-315).[7]

18. The Bank has a Code of Conduct and Ethics. (Def. 298-308).[8]

19. Plaintiff attended mandatory training regarding the Whistleblower Policy and Code of Conduct and signed Certifications that she received, read and understood the Employee Handbook, Whistleblower Policy and Code of Conduct. (Ex. A, Pl. Dep. 15:12-24; Kurzmann 221, 222, 223).[9]

## II. ALL BANK EMPLOYEES RECEIVE WARNINGS WHEN THEY APPROACH "NO PAY' STATUS

20. In 2015, her last full year of employment, Plaintiff had been with the Bank between 10 and 19 years and was entitled to 15 vacation days. (Ex. A, Pl. Dep. 102:8-19).

21. At that time, Plaintiff also received 10 paid holidays per year. (*Id.* at 102:20-22).

22. Plaintiff also received a "half comp day" for each Saturday that she worked, which in 2015 equated to 23 additional days off. (*Id.* at 103:1-104:1; Def. 1017).[10]

23. The Leave Without Pay policy does not state if an employee reaches a "no-pay" status and takes "no-pay" days off during the calendar year, the employee will be fired. (Ex. D, Def. 285; Ex. A, Pl. Dep. 21:21-24).

24. Christine Heiser, Director of Human Resources, prepares an "attendance report" each month for every employee at the Bank that includes how many days off each employee has taken in that month and the remaining balance of their available paid time off. (Ex. E, Christine Heiser Dep. 21:4-21).

---

[7] The Whistleblower Policy is attached to the Exhibit List as **Exhibit F**.
[8] The Code of Conduct and Ethics is attached to the Exhibit List as **Exhibit G**.
[9] Plaintiff's signed Certifications are collectively attached to the Exhibit List as **Exhibit H**.
[10] A document showing Plaintiff's 2015 "comp time" is attached to the Exhibit List as **Exhibit I**.

{02362326;v1 }   6

25. All Bank employees regularly receive warnings when they approached a no pay status. (Ex. E, Christine Heiser Dep. 29:15-19; Def. 629, 630, 631, 632, 635, 636, 637; Mary Hood Dep. 13:13-16).[11][12]

26. These notices are sent by Ms. Heiser as part of her human resources job responsibilities, and are not directed by Ms. Roehner. (Ex. E, Christine Heiser Dep. 30:9-17).

27. Like other Bank employees, Plaintiff received warnings from the Bank when she approached a no pay status. For example, on July 22, 2016 Plaintiff received an email from Ms. Heiser stating that she had utilized all of her PTO for 2016 and had reached a "no pay" status; and on June 19, 2015 she received a memorandum from her supervisor Ms. Rush stating she had used all her allotted sick days for 2015. (Def. 0021,0032.)[13]

28. Mary Hood, former Teller Supervisor, was warned by Ms. Roehner about her taking "no pay time" both before and after Ms. Roehner became President; and John Douglass, Joe Tryon (former President) and Constance Wood (former Senior Vice President) also gave similar warnings to her. (Ex. K, Mary Hood Dep. 12:19-14:4).

29. Although plaintiff regularly exceeded her allotted PTO/vacation, and entered a "no pay" status, she never received any discipline whatsoever for doing so. (Ex. A, Pl. Dep. 38:9-18).

30. Plaintiff exceeded her allotted paid time off and entered a "no pay" status in 2010, 2011, 2012 and 2014 and was not disciplined in any of those years for doing so. (*Id.* at 39:11-15).

---

[11] Examples of warnings to Bank employees regarding "no pay" status are collectively attached to the Exhibit List as **Exhibit J**.
[12] The cited pages of Mary Hood's deposition transcript are collectively attached to the Exhibit List as **Exhibit K**.
[13] The July 22, 2016 email from Ms. Heiser to Plaintiff and June 19, 2015 memorandum from Ms. Rush to Plaintiff are collectively attached to the Exhibit List as **Exhibit L**.

31. On Plaintiff's 2014 Employee Performance Assessment, she received a rating of 2 (needs training) for attendance, and the Bank noted "attendance issues" in the comments section of the evaluation. (Defs. 55-56).[14]

32. On Plaintiff's 2015 Employee Performance Review, she received a rating of 2 (below standard) for attendance, and the Bank noted "frequent absenteeism" in the comments section of the evaluation. (Defs. 52-54).[15]

33. Plaintiff was given extra time off by the bank beginning in 2012 for medical procedures relating to possible breast cancer and breast reconstruction. (Ex. A, Pl. Dep. 252:6-14).

34. From February 2012 through 2016, Plaintiff "pretty consistently" experienced serious medical conditions and Plaintiff had at least three surgeries and a reconstruction including in June, July and September 2015 and January and February 2016. (Ex. A, Pl. Dep. 252:15-253:3; Dkt. Entry 1, Compl. ¶ 7).

35. Mary Hood, the Bank's former Teller Supervisor, exceeded her allotted paid time off and entered a "no pay" status in 2009, 2010, 2011, 2012, 2013, 2014 and 2015 and was not disciplined in any of those years for doing so. (Ex. K, Mary Hood Dep. 26:10-27:16).

36. In 2014, in addition to Plaintiff, ten other employees took "no pay" days. In excess of the paid time off to which they were entitled (Def. 1026).[16]

37. Although she worked for Hatboro Federal for approximately 18 years, Plaintiff could not identify a single person that was ever terminated for violating the Leave Without Pay policy. (Ex. A, Pl. Dep. 26:7-19).

---

[14] Plaintiff's 2014 Employee Performance Assessment is attached to the Exhibit List as **Exhibit M**.
[15] Plaintiff's 2015 Employee Performance Review is attached to the Exhibit List as **Exhibit N**.
[16] The Bank's chart showing employees that had "no pay" days in 2014 is attached to the Exhibit List as **Exhibit O**.

38. Although she worked for Hatboro Federal for approximately 27 years, Ms. Hood could not identify a single person that was ever terminated for violating the Leave Without Pay policy. (Ex. K, Mary Hood Dep. 27:16-28:4).

39. Plaintiff acknowledges it is appropriate for Ms. Roehner, as President of the Bank, to discuss with employees how much paid time off they have used and have remaining. (Ex. A, Pl. Dep. 114:20-115:1).

### III. PLAINTIFF BEGAN QUESTIONING THE LEAVE WITHOUT PAY POLICY YEARS PRIOR TO HER TERMINATION

40. Plaintiff first began questioning Ms. Roehner regarding the Leave Without Pay policy in 2014 – years prior to her termination. (Ex. A, Pl. Dep. at 111:11-23; 112:19-113:10).

41. Plaintiff testified:

> Q. My question is, why do you think the bank singled you out?
>
> A. I think the bank singled me out because I kept questioning this policy about no pay time.
>
> Q. When is the first time you ever questioned that policy?
>
> A. Years ago. It all started I think like '14 when Linda took over.
>
> Q. You're telling me in 2014 you questioned that policy, the paid time off policy?
>
> A. When I had to ask for extra time off, I never had a problem with the former president.
>
> Q. That's okay
>
> A. And then I started questioning it, yes.

(*Id.* 111:6-23).

42. Plaintiff was not disciplined in any way for questioning the "Leave Without Pay" policy beginning in 2014. (*Id.* 112:8-11).

IV. **PLAINTIFF DID NOT REQUEST AN ACCOMMODATION IN JULY 2016**

43. In or around July 2016, after having an ultrasound of her breasts, Plaintiff met with Ms. Roehner to discuss the possibility that she may need to take time off in the future, "I told her I may have to ask her for a leave of absence if my biopsy comes back where I need to have another surgery." (*Id.* 24:1-6).

44. Plaintiff testified,

> Q. Well, in July of '16 when you went to Ms. Roehner, did you say that you needed to undergo surgery in August of '16?
>
> A. No, I said if I need surgery to have it removed.

(*Id.* 43:17-23).

45. Plaintiff did not make a request for time off during the meeting with Ms. Roehner. (*Id.* 70:11-13).

46. Because she was unsure if she would need surgery, the meeting was not to formally request time off, but instead for Plaintiff to "put her ducks in a row" and give Ms. Roehner "a heads up." (*Id.* 70:14-24).

47. As of the date of Plaintiff's deposition on August 2, 2021 (more than five years later), Plaintiff still had not undergone the procedure she purportedly discussed with Ms. Roehner. (*Id.* 54:15; 58:20-59:1).

V. **PLAINTIFF'S TERMINATION**

48. As Branch Manager, Plaintiff was an at-will employee and executed a "Hatboro Federal Savings At-Will Acknowledgment" on January 29, 2014. (Ex. A, Pl. Dep. 13:10-14:10; Kurzmann 0225).[17]

49. As Branch Manager, Plaintiff reported to Suzanne Rush, Branch Coordinator and John Douglass, Vice President, Chief Operating Officer (Ex. A, Pl. Dep. 10:11-14; Ex. B, John Douglass Dep. 10:11-10:17; 18:7-10).

50. On August 12, 2016, Plaintiff received a Memorandum from Mr. Douglass and Ms. Rush, the subject of which was "Conduct Probation" (**"Probation Memorandum"**). (Def. 114-118; Ex. A, Pl. Dep. 130:11-17).[18]

51. It was Mr. Douglass' decision to place Plaintiff on conduct probation, which was subsequently approved by Ms. Roehner. (Ex. B, John Douglass Dep. 26:13-18).

52. Bank employees other than Plaintiff have regularly been placed on conduct probation; during Mr. Douglass' tenure as COO, he estimated he was personally involved in placing "easily five to ten" employees on conduct probation. (Ex. B, John Douglass Dep. 59:23-60:3; Def. 676, 677, 678, 679, 683-84, 685, 686. 688, 689, 691, 699-700 ).[19]

53. The Probation Memorandum details management's dissatisfaction with Plaintiff's work performance, and states in pertinent part:

> In the last two years, you have developed a pattern or errors that indicate that you are not keeping up with new policies and procedures. A copy of the infractions is attached to this memo. This type of work production is not acceptable for any employee, let alone a manager. . . . You have also developed a habit of lateness on regular work days and Saturdays.

---

[17] Plaintiff's "at will" Acknowledgement is attached to the Exhibit List as **Exhibit P**.
[18] The Probation Memorandum is attached to the Exhibit List as **Exhibit Q**.
[19] Documents demonstrating Bank employees' being placed on probation are collectively attached to the Exhibit List as **Exhibit R**.

> Extended lunches and breaks out of the office for errands or emergencies has also been noticed. This behavior is also not acceptable for a supervisor to the point that we feel you are abusing the privilege of your managerial position

(Ex. Q, Def. 114).

54. Attached to the Probation Memorandum is a 4 page attachment that details 31 different errors and issues involving Plaintiff from November 2014 through August 2016. (Ex. Q, Def. 115-118).

55. Notwithstanding the extensive list of errors made by Plaintiff, the Bank did not seek to terminate Plaintiff at that time, but instead desired to place her on a 90-day probation and provided a plan for her to be retrained at the Hatboro branch and then returned to her Branch Manager position in the Warminster branch. (Ex. Q, Def. 114; Ex. C, Linda Roehner Dep. 73:3-11; Ex. B, John Douglass Dep. 31:24-32:1).

56. The Probation Memorandum states:

> As a result of your action, you are being placed on a 90 day conduct probation period. You are being transferred to the main office where Suzanne Rush, the Branch Coordinator, can monitor your work performance and address any areas of deficiency. Immediate improvement must be displayed on your part. Any future violations will result in further disciplinary action, up to and including termination.

(Ex. Q, Def. 114).

57. The Probation Memorandum was presented to Plaintiff at a meeting on August 12, 2016. (Ex. A, Pl. Dep. 130:11-22; Ex. B, John Douglass Dep. 25:7-25:18).

58. During the meeting Plaintiff was specifically informed that it was not the Bank's intention to terminate her, but instead to retrain her at the Hatboro branch and, if she demonstrated improved performance, she would resume her duties as the Branch Manager of the Warminster branch. (Ex. C, Linda Roehner Dep. 73:3-11; Ex. A, Pl. Dep. 143:9-14).

59. The Bank is within its rights to transfer an employee, including Plaintiff, to another branch for retraining. (Ex. A, Pl. Dep. 143:15-24).

60. Plaintiff refused to sign the Probation Memorandum. (*Id.* 139:14-20).

61. On August 12, 2016, following the meeting at which Plaintiff was given the Probation Memorandum, Plaintiff and Ms. Roehner had a telephone discussion at which time Ms. Roehner suggested to Plaintiff that, if she feels the Probation Memorandum is incorrect, she should respond to the Probation Memorandum in writing and identify what she believes is inaccurate. (Ex. C, Linda Roehner Dep. 151:23-152:19; Ex. A, Pl. Dep. 134:2-11).

62. Plaintiff refused to respond in writing to the Probation Memorandum (Ex. A, Pl. Dep. 166:24-167:21).

63. On August 15, 2016, a meeting was held with Plaintiff, Ms. Roehner and Mr. Douglass concerning the Conduct Probation Memorandum and Plaintiff being directed to report to the Hatboro branch for retraining. (Def. 19).[20]

64. Following the meeting, Mr. Douglass sent an email to Plaintiff directing her to report to the Hatboro branch by 8:45 a.m. August 16, 2016. (Def. 0020; Ex. A, Pl. Dep. 175:2-9).[21]

65. After initially expressing reservations regarding doing so due to the "stress" of the situation, Plaintiff reported to the Hatboro branch on August 15, 2016. (Ex. A, Pl. Dep. 174:12-23).

66. On August 16, 2016, Plaintiff's first day of reporting to the Hatboro branch and the fourth day of Plaintiff's 90-day probation, Ms. Rush informed Ms. Roehner and Mr.

---

[20] A Memorandum from Mr. Douglass memorializing the August 15, 2016 meeting is attached to the Exhibit List as **Exhibit S**.
[21] Mr. Douglass' August 15, 2016 email is attached to the Exhibit List as **Exhibit T**.

{02362326;v1 } 13

Douglass that Plaintiff was not performing the duties asked of her. (Def. 110; Ex. A, Pl. Dep. 177:8-22).[22]

67. On August 16, 2016, Frank Jarett, a member of Hatboro Federal's board of directors contacted Ms. Roehner to inform her of an incident that had occurred involving Plaintiff. (Frank Jarrett Dep. 31:21-22:5).[23]

68. Mr. Jarrett was in a local business in Hatboro on business unrelated to the Bank when he had an interaction with Plaintiff. (*Id.* 15:22-16:2; 16:20-17:3).

69. At the direction of Ms. Roehner, Mr. Jarrett made a contemporaneous written statement regarding the encounter with Plaintiff. The written statement describes the encounter between Mr. Jarrett and Plaintiff in a local used car dealership office on August 16, 2016 as follows:

> All of a sudden Barb starts saying how bad things are at the bank (Hat Fed) and how everybody is unhappy and "I could ask anyone." She said people are being "bullied" and she disparaged the bank in a very demonstrative way. William [a car dealership employee] sat there and heard it all but had no response. She left and shortly thereafter I left.

(*Id.* 22:23-232; 24:21-25:4; Def. 552-56).[24]

70. Mr. Jarrett was involved in the drafting of the Bank's Whistleblower Policy and he did not perceive the interaction with Plaintiff to be a complaint under the Bank's Whistleblower policy, but instead that Plaintiff was merely making a "statement" to him. (Ex. V, Frank Jarrett Dep. at 27:2-11; 50:4-13).

---

[22] Ms. Rush's August 16, 2016 email is attached to the Exhibit List as **Exhibit U**.
[23] The cited pages of Frank Jarrett's deposition transcript are collectively attached to the Exhibit List as **Exhibit V**.
[24] Frank Jarrett's handwritten notes are attached to the Exhibit List as **Exhibit W**.

71. Mr. Jarrett was on the Bank's board of directors for 35 years until his voluntary resignation in January 2020 and is unaware of a single complaint under the Whistleblower policy ever being brought to the board of directors (*Id.* at 12:2-12; 28:23-29:1).

72. As a result of what Mr. Jarrett communicated was the substance of the interaction between he and Plaintiff, on August 17, 2016, Ms. Roehner and Mr. Douglass had a meeting with Plaintiff to discuss her encounter with Mr. Jarrett. (Ex. C, Linda Roehner Dep. 18:18-20:14; Ex. B, John Douglass Dep. 14:17-24).

73. Prior to the meeting, it was not the Bank's intention to terminate Plaintiff, but to have a discussion with Plaintiff regarding how the encounter with Mr. Jarrett was handled. (Ex. B, John Douglass Dep. 16:17-17:1).

74. At that meeting, Ms. Roehner and Mr. Douglass believed Plaintiff stated that she did not believe her actions were in any way inappropriate and that she was she was free to speak her views about the bank wherever and in whatever manner she deemed appropriate, including in public, at local businesses, and in her capacity as a member of the Warminster Chamber of Commerce. (Ex. C, Linda Roehner Dep. 18:18-20:14; Ex. A, Pl. Dep. 200:11-15; Ex. B, John Douglass Dep. 18:18-19:2).

75. At the meeting, Plaintiff stated to Ms. Roehner and Mr. Douglass, "anybody can bad-mouth in any public place if they want to." (Ex. A, Pl. Dep. 200:16-22).

76. After giving Plaintiff what Ms. Roehner and Mr. Douglass perceived were several opportunities to recant this position, and Plaintiff's refusal to do so, Ms. Roehner terminated Plaintiff. (Ex. C, Linda Roehner Dep. 18:18-20:14; Ex. B, John Douglass Dep. 19:8-20:3).

## VI. **MISCELLANEOUS**

77. Prior to the chance encounter with Mr. Jarrett on August 16, 2016, Plaintiff never complained about the Leave Without Policy to any board member or Human Resources and never made a written complaint about the policy. (Ex. A, Pl. Dep. 115:16-116:1).

Respectfully submitted,

SEMANOFF ORMSBY
 GREENBERG & TORCHIA, LLC


By: ___/s/ Stephen C. Goldblum___
    MICHAEL J. TORCHIA, ESQUIRE
    STEPHEN C. GOLDBLUM, ESQUIRE
    2617 Huntingdon Pike
    Huntingdon Valley, PA  19006
    (215) 887-0200
    sgoldblum@sogtlaw.com

    *Attorneys for Defendant*
    *Hatboro Federal Savings*

Dated:  January 4, 2022

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BARBARA KURZMANN | : |
| Plaintiff | : Civil Action No. 2:21-cv-00766 |
| v. | : |
| HATBORO FEDERAL SAVINGS | : |
| Defendant | : |

**CERTIFICATE OF SERVICE**

I hereby certify that on the date indicated below service of a true and correct copy of Defendant Hatboro Federal Savings' Statement of Undisputed Material Facts was made via ECF upon the following:

William P. Mansour, Esquire
1101 Hamilton Street, Suite 205
Allentown, PA  18101
wpm@themansourfirm.com

Ralph A. Powell, Esquire
2110 Harpers Xing
Langhorne, PA  19047
rpowell@rpowell-law.com

*Attorneys for Plaintiff*

        /s/ Stephen C. Goldblum
STEPHEN C. GOLDBLUM, ESQUIRE

DATED:  January 4, 2022

{02362326;v1 }                    17