# EXHIBIT "A"

Barbara Kurzmann Palinkas

1              UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF PENNSYLVANIA

3                      -   -   -

4

5    BARBARA KURZMANN            :    CIVIL ACTION

              Plaintiff         :

6                                :

         V.                      :

7                                :

     HATBORO FEDERAL SAVINGS     :

8         Defendant             :    2:21-cv-00766

9

10                     -   -   -

11                 August 2, 2021

12                     -   -   -

13

14              Oral deposition of BARBARA

15   KURZMANN PALINKAS, held in the offices of

16   Semanoff, Ormsby, Greenberg & Torchia, LLC, 2617

17   Huntingdon Pike, Huntingdon Valley, Pennsylvania

18   19006, commencing at or about 10:11 a.m. on the

19   above date, before Kathleen A. Zerman, a

20   Professional Reporter and Notary Public of the

21   Commonwealth of Pennsylvania.

22                     -   -   -

23              GOLKOW LITIGATION SERVICES

              877.370.3377 ph/917.591.5672 fax

24                 deps@golkow.com

Barbara Kurzmann Palinkas

1    in preparation for this deposition?

2         A.    I did not because I don't

3    know where I put them when I moved.  I

4    would have, but I didn't.

5         Q.    Okay.  Did you discuss your

6    deposition today with anyone?

7         A.    I did not.

8         Q.    Okay.  Your last date of

9    employment at Hatboro Federal Savings was

10   August 17th of 2016?

11        A.    Yes.

12        Q.    And at that time, you were a

13   branch manager in the Warminster branch;

14   is that right?

15        A.    Yes.

16        Q.    And how long had you been a

17   branch manager in the Warminster branch?

18        A.    I went from assistant to

19   branch manager.  Probably maybe five

20   years.

21             I really don't remember how

22   many because I went up the chain from

23   teller to assistant to manager.

24        Q.    Okay.  You don't know the

Barbara Kurzmann Palinkas

```
 1      year that you became actually the branch

 2      manager when you were promoted from the

 3      assistant branch manager?

 4              A.     Maybe 2008 --

 5              Q.     Okay.

 6              A.     -- is a guess.

 7              Q.     Okay.  The records show

 8      2007.  Does that sound like it could be

 9      right?

10              A.     I was close.  Yeah.

11              Q.     Okay.  And at the time of

12      your termination in August of 2016, who

13      was your supervisor?

14              A.     Suzanne Rush.

15              Q.     And what was her position,

16      if you recall?

17              A.     She's like a branch

18      coordinator of all the managers.

19              Q.     Okay.  And at that time did

20      you have subordinates that reported to

21      you as the branch manager?

22              A.     I did.

23              Q.     And can you describe, you

24      know, how many or the types of people
```

Barbara Kurzmann Palinkas

1    and familiarize yourself with it.  Your

2    counsel will also get a copy of it, but

3    if I'm going to point to a specific

4    portion of the exhibit, I will do that.

5    I'm going to do that now.

6                    (Whereupon, Exhibit

7            Kurzmann-1 was marked for

8            identification.)

9    BY MR. GOLDBLUM:

10           Q.    The document that the court

11   reporter has just identified as

12   Kurzmann-1 is a package of eight

13   different pages that I have assembled and

14   I just want to go through and confirm

15   that these are your signatures and ask

16   you a couple brief questions on these.

17                   On the first page of this

18   exhibit, it's a Hatboro Federal Savings

19   At-Will Acknowledgment.  Is that your

20   signature?

21           A.    Yes.

22           Q.    Dated January 29th, 2014?

23           A.    Uh-huh.  Yes.

24           Q.    And it says at the top,

Barbara  Kurzmann  Palinkas

```
 1      either the association, referring to

 2      Hatboro Federal Savings, or the employee

 3      can terminate the employment relationship

 4      at any time, with or without cause, with

 5      or without notice.  This is called

 6      Employment At Will.

 7                  Did you understand the

 8      concept of employment at will when you

 9      signed this?

10           A.     I did.

11           Q.     Okay.  The second page is an

12      employee certification of compliance with

13      the code of conduct and ethics.

14                  Is that your signature dated

15      October 3rd, 2015?

16           A.     Yes.

17           Q.     And in paragraph one you

18      certify that you read the code of conduct

19      at least once during the past 12 months

20      and you understood your responsibility to

21      comply with it.

22                  Is that accurate, had you

23      read it?

24           A.     Yes.
```

Barbara Kurzmann Palinkas

1          Q.    The third page of this

2    exhibit is a Whistleblower policy

3    employee certification.

4                Is that your signature dated

5    October 3rd, 2015?

6          A.    Yes.

7          Q.    And you certified that you

8    had received, read and understood the

9    Hatboro Federal Savings Bank

10   Whistleblower policy; is that accurate?

11         A.    Yes.

12         Q.    The next page is a Hatboro

13   Federal Savings staff training sign-in

14   sheet from October 22nd of 2015 regarding

15   the Code of Conduct and Whistleblower

16   policy.

17               Is that your signature next

18   to your name?

19         A.    Yes.

20         Q.    Okay.  And did you, in fact,

21   attend that training?

22         A.    I believe I did.  If I

23   signed it, I was there.

24         Q.    Okay.

Barbara Kurzmann Palinkas

1          A.    And I do remember her name

2     now.  I don't know why it went out of my

3     head.

4          Q.    There you go.

5          A.    But it was Patty McBride.

6          Q.    Patty McBride?

7          A.    McBride.

8          Q.    And she was the other

9     teller?

10          A.    She was the assistant and

11     teller, slash.

12          Q.    Okay.  So just to be clear,

13     to go back to that for a moment.

14              So you had -- you had

15     mentioned that you had three subordinates

16     at the time of your termination, Donna

17     Zawadzki, Kathy Malonowski and Patty

18     McBride; is that right?

19          A.    No.  Donna was gone.  It was

20     just Kathy and Patty.

21          Q.    Okay.  Back to Exhibit 1.

22              The next page it says

23     Hatboro Federal Savings Employee Handbook

24     and it's an employee certification dated

Barbara Kurzmann Palinkas

1    December 3rd of 2015.

2                    Is that your signature?

3         A.    Yes.

4         Q.    And in this certification,

5    you acknowledge that you received, read

6    and understand the Hatboro Federal

7    Savings Employee Handbook and that you

8    understand you're responsible for abiding

9    by all the provisions of the handbook as

10   well as the other policies and procedures

11   of the bank.

12                    Is that accurate, did you

13   certify to that effect?

14        A.    Yes.

15        Q.    The next page is an

16   acknowledgment that you had reviewed a

17   copy of the Hatboro Federal Savings

18   Employee's Personnel Manual.

19                    Is that your signature?

20        A.    Yes.

21        Q.    Dated January 5th, 2016; is

22   that right?

23        A.    Maybe I'm on the wrong page.

24   The acknowledgment, right?

Barbara Kurzmann Palinkas

1          A.     I do.

2          Q.     Okay.  I'd like to go

3    through it with you for a minute and talk

4    about it then.

5                 So what it says is, leave

6    without pay is subject to approval by the

7    president.

8                 Who was the president at the

9    time of your termination?

10         A.     Linda Roehner.

11         Q.     It next states, it is only

12   granted in extraordinary circumstances.

13   Please note that if an employee reaches a

14   "no pay" status and takes "no pay" days

15   off during the calendar year, without

16   written permission of the President,

17   disciplinary action up to and including

18   immediate termination may be taken.

19                Did I read that accurately?

20         A.     Yes.

21         Q.     Okay.  Does it say in here

22   that if you take one additional day off,

23   you'll be fired?

24         A.     No.

Barbara Kurzmann Palinkas

```
1           Q.    Okay.  And were you -- what
2      were you asking for?
3           A.    I told her I may have to ask
4      her for a leave of absence if my biopsy
5      comes back where I need to have another
6      surgery.
7           Q.    Okay.
8           A.    And her response was, you
9      know what happens with no pay days.
10          Q.    Okay.  Hold on.
11          A.    May I?
12          Q.    No.  You can wait for a
13     question.
14          A.    Okay.
15          Q.    Okay.
16                (Whereupon, Exhibit
17                Kurzmann-3 was marked for
18                identification.)
19     BY MR. GOLDBLUM:
20          Q.    So the next exhibit that has
21     been labeled as Kurzmann-3 is the Charge
22     of Discrimination that you filed with the
23     Equal Employment Opportunity Commission.
24                Do you recognize this
```

Barbara Kurzmann Palinkas

```
 1          A.    Yes, it is.
 2          Q.    And did you read this
 3    Complaint at the time that you filed it
 4    with the Equal Employment Opportunity
 5    Commission?
 6          A.    I did.
 7          Q.    Okay.  In the first
 8    paragraph below where it says Statement
 9    of Complaint, it says, and I'll read it
10    in part, if an employee has used up all
11    their paid days off, including vacation,
12    sick and personal and they are
13    temporarily disabled for medical reasons
14    and cannot come to work, they are
15    terminated; is that accurate?
16          A.    Yes, I believe so.
17          Q.    Can you name one person that
18    was ever fired for that reason?
19          A.    No.
20          Q.    Okay.  Then you write, that
21    is, the policy as stated, quote, if an
22    employee requires a non-paid day off,
23    even one day, they are fired, end quote.
24                Is that what the policy says
```

Barbara Kurzmann Palinkas

```
 1         fired.
 2                MR. GOLDBLUM:  Okay.  Let's
 3         go off the record for a minute.
 4                (Discussion held off the
 5         record.)
 6                (Whereupon, Exhibit
 7         Kurzmann-4 was marked for
 8         identification.)
 9    BY MR. GOLDBLUM:
10         Q.    We're back on the record.  I
11    have -- I just handed you a document
12    that's been labeled as Kurzmann-4.  It's
13    the Hatboro Federal Savings Employee
14    Handbook effective January 1 of '16.  So
15    this was in place at the time of your
16    termination.
17                At the bottom right, if you
18    look at page 285, you'll see that it has
19    the same Leave Without Pay policy that we
20    were just discussing.  Okay?
21                And if I could direct you to
22    page 278, the section that has to do with
23    the Americans with Disabilities Act.
24                When you were employed by
```

Barbara Kurzmann Palinkas

1      the bank, were you familiar with this

2      provision of the handbook?

3             A.    I probably read it, yes,

4      because I don't sign anything that I

5      don't read.

6             Q.    Okay.  And we just discussed

7      before we took a break that you believe

8      that cancer could be a disability, and

9      what it states here under reasonable

10     accommodation says, a reasonable

11     accommodation is any change in the work

12     environment to help a person with a

13     disability apply for a job, perform the

14     duties of a job, or enjoy the benefits

15     and privileges of employment.  Qualified

16     applicants or employees who are disabled

17     should request reasonable accommodation

18     from their supervisor or the Human

19     Resources Department in order to allow

20     them to perform a particular job.

21                    Did I read that right?

22             A.    Uh-huh.

23             Q.    Did you go to your

24     supervisor Suzanne Rush and ask her for a

Barbara Kurzmann Palinkas

1    reasonable accommodation of additional

2    time to deal with your cancer?

3         A.    No, I did not because she

4    wasn't the one to give the permission.

5    It had to be the president.

6         Q.    Did you go to human

7    resources in order to allow them to grant

8    you a reasonable accommodation?

9         A.    No, I did not.  I went right

10   to the president.

11        Q.    Okay.  Does it say in this

12   Americans with Disabilities Act provision

13   that you need to go to the president?

14        A.    No, but it does say on the

15   sick leave time she's the only one that

16   can grant you extra time off without pay.

17   So --

18        Q.    Okay.

19        A.    And at the time I didn't

20   think I would have to go through this.  I

21   thought she would grant me the time if,

22   in fact, I needed it.

23        Q.    Okay.  So what you're saying

24   is you didn't follow the ADA

Barbara Kurzmann Palinkas

1    accommodation policy as it's written in

2    this handbook, right?

3         A.    I did not.

4         Q.    What made you think that

5    your request for additional time off due

6    to cancer did not fall within this

7    Americans with Disabilities Act policy?

8         A.    Because I was not going by

9    that.  I was going by what I had to do to

10   ask permission from the president for the

11   time off if, in fact, I needed the

12   surgery and I got my answer.  I didn't

13   even think about going through that after

14   the answer I got --

15        Q.    Okay.

16        A.    -- or I would have, believe

17   me.

18        Q.    After you spoke to Ms.

19   Roehner, and we'll talk about that in a

20   few minutes, did you then go to human

21   resources and say I need a leave under

22   the Americans with Disabilities Act?

23        A.    I did not.  I told her I

24   wanted a meeting with the board because

Barbara Kurzmann Palinkas

```
 1      only one that can give you that answer in
 2      the Leave of Absence policy, though, or
 3      the leave of --
 4              Q.    I understand that.
 5                    Assuming you're under the
 6      Leave Without Pay policy and not the ADA
 7      policy, right?
 8              A.    Right.
 9              Q.    Okay.  During your
10      employment, had you ever exceeded the
11      leave without -- the number of days of
12      leave without pay?
13              A.    Some years.  Some years when
14      I needed the surgeries and I had
15      permission from the former president.
16              Q.    Did you ever receive any
17      discipline for doing so?
18              A.    No.
19              Q.    Okay.  And you were never
20      written up or terminated, right?
21              A.    I was written on an incident
22      report where I still had nine vacation
23      days left and I mentioned it to Mr.
24      Douglass and he said I should not have
```

Barbara Kurzmann Palinkas

1    been written up.

2           Q.    Okay.  You're jumping ahead

3    on all my questions here.  You're trying

4    to tell the whole story --

5           A.    I apologize.

6           Q.    -- here, and you'll have all

7    day to tell your side of the story, but I

8    need you to be responsive to my questions

9    if you can.

10          A.    Okay.

11          Q.    Would you agree that you

12   exceeded your amount of paid time off in

13   2010?

14          A.    2010.  I believe I might

15   have in '10.

16          Q.    Okay.  How about 2011?

17          A.    I think I had a half a day

18   one of those.  I'd have to look at my

19   notes because I have my evaluations and I

20   can see what -- if I went over or if I

21   carried over.  I can't really remember

22   off the top.

23          Q.    Okay.  According to the

24   bank's records, you had exceeded the

Barbara Kurzmann Palinkas

```
1              A.    I put it off because I was
2    afraid I was losing my job if I took days
3    off.  I did not have the surgery.
4              Q.    Okay.  What is the surgery
5    in July 2016 that you thought you needed
6    to have?
7              A.    Pre-cancer papilloma removed
8    from a biopsy that came back and I was
9    waiting on the results of that to see
10   what they wanted to do.
11             Q.    Okay.
12             A.    And that's when I approached
13   to -- just to get a feel of am I going to
14   be able to take these days off to get the
15   surgery or do I have to wait till
16   January.
17             Q.    Well, in July of '16 when
18   you went to Ms. Roehner, did you say that
19   you needed to undergo surgery in August
20   of '16?
21             A.    No.  I said if I need to
22   have surgery to have it removed.
23             Q.    Okay.
24             A.    I should have typed it
```

Barbara  Kurzmann  Palinkas

```
1              Q.     He was in the room and it
2       was on a speaker?
3              A.     Yes.
4              Q.     Okay.  Do you keep a journal
5       or diary or anything?
6              A.     Not really.
7              Q.     Nothing that would have a
8       specific date of when you spoke to the
9       doctor?
10             A.     No.  No, I don't keep
11      anything like that.
12             Q.     Okay.
13             A.     When I'm done with it, I'm
14      done with it.
15             Q.     Okay.  The second page of
16      this exhibit discusses the results of the
17      ultrasound performed on July the 27th of
18      2016, and what it says is the -- under
19      impression, about halfway down, in part,
20      tissue sampling of the masses is
21      recommended.  These would probably be
22      amenable to ultrasound-guided sampling.
23      If these both cannot be sampled, it's
24      suggested that the more accessible mass
```

Barbara  Kurzmann  Palinkas

1    these documents that says that they --

2    strike that.

3              So let me just understand

4    what was happening.  So you went in and

5    got an ultrasound in July, right, and

6    they determined that there were two areas

7    of what they called --

8         A.     Papilloma.

9         Q.     Well, I won't use the

10    medical term.

11             There were two areas of

12    palpable concern to the patient.  So you

13    were concerned about it, and then

14    ultimately, you went in in January.  You

15    got an ultrasound and determined that

16    these were benign, right?

17         A.     Correct, because I did not

18    have the surgery.

19         Q.     Correct.

20             And since that time, since

21    January of '17 you have not had these

22    removed, right?

23         A.     No.  I'm going to have them

24    now because they've changed.  We've been

Barbara Kurzmann Palinkas

```
1      watching them.
2             Q.    I understand, but it's been
3      years.
4                   Even when you got the
5      ultrasound in January of '17, there was
6      no need to take them out?
7             A.    No.  I didn't.
8             Q.    So then --
9             A.    We were just going to follow
10     them just like the plan.
11            Q.    Okay.  So --
12            A.    And we have been ever since.
13            Q.    I understand that.
14                  There's nothing in these
15     documents that -- in any of your medical
16     documents that state that Dr. Evers said
17     you should have these taken out?
18            A.    She did.
19            Q.    I understand you're saying
20     that.
21            A.    Hundred percent positive.
22            Q.    Why would she have said take
23     them out before you even had the
24     ultrasound -- or I'm sorry, before you
```

Barbara Kurzmann Palinkas

```
 1          Q.    Does it say anything about a
 2   medical accommodation in that section?
 3          A.    Not that I remember it.
 4          Q.    Okay.  Well, we can look at
 5   it if you want, but there's an entire
 6   section on medical accommodations, right?
 7          A.    Right.
 8          Q.    And you just ignored that
 9   section?
10          A.    Yes, because I was more
11   worried about missing time and losing my
12   job.  I was more concerned on that other
13   section.
14          Q.    Okay.  When you spoke to Dr.
15   Evers, did you tell the doctor that you
16   had no pay days or that you had no no pay
17   days left?
18          A.    I said to her can we do --
19   can we watch it until January until I
20   have new paid time off.  I would be
21   afraid I would get fired if I missed days
22   without pay.
23          Q.    Okay.
24          A.    I worded it differently, but
```

Barbara Kurzmann Palinkas

```
 1              A.     Not that I remember.
 2              Q.     Well, you just said a minute
 3     ago you understood the procedure to be an
 4     outpatient and then you might need some
 5     time to recover?
 6              A.     Correct.  It could be a
 7     week.  It depends on if you have an
 8     infection.  It depends on how you were
 9     feeling.  It could be four days, two
10     days.  I have no prediction of it.
11              Q.     Okay.  So you didn't ask for
12     any specific amount of time?
13              A.     No, I did not.
14              Q.     And you didn't even know if
15     it was going to happen?
16              A.     Correct.  I was putting my
17     ducks in a row in case.
18              Q.     So you weren't formally
19     requesting anything?
20              A.     No, I didn't formally
21     request it until I knew.
22              Q.     Okay.
23              A.     I was giving her a heads up
24     in other words.
```

Barbara Kurzmann Palinkas

```
 1            Q.    Okay.  Well, let's just talk
 2     about 2015, your last full year, for a
 3     minute.  Okay?
 4            A.    Uh-huh.
 5            Q.    It's not a document.  This
 6     is just something else.
 7            A.    Okay.
 8            Q.    So according to the policy,
 9     and we can look in the handbook, you were
10     receiving -- you don't have to look
11     yet -- you were receiving 15 days of paid
12     time off, right?
13            Do you recall that to be
14     correct?
15            A.    Correct.
16            Q.    Because you were there
17     between 10 and 19 years, you get 15 days,
18     right?
19            A.    Uh-huh.
20            Q.    And you also got ten paid
21     holidays; is that right?
22            A.    Uh-huh.
23            Q.    So that's a total of 25
24     days.
```

Barbara Kurzmann Palinkas

1                    Now, comp time.  What was

2      the bank's policy on comp time?

3            A.    Well, it changed.

4            Q.    Well, in '15?

5            A.    In '15, I believe you worked

6      a Saturday and then you got a half a

7      day --

8            Q.    Correct.

9            A.    -- off.

10           Q.    So in 2015, you worked 23

11     Saturdays, which means you got 23

12     one-half days which is -- 23 half comp

13     days which is 11 and a half days of comp,

14     right?

15           A.    Uh-huh.

16           Q.    Does that sound accurate to

17     you?

18           A.    I'm not sure how many

19     Saturdays.

20           Q.    Well, the records say it was

21     23.  Does that sound like it could be

22     right?

23           A.    I don't know.  I mean, I

24     worked Saturdays.  I don't know how many.

Barbara Kurzmann Palinkas

1    I couldn't even guess.

2            Q.    Okay.  And you also had a

3    floating day, right?

4                  You had a floating vacation

5    day.  Do you recall that?

6            A.    I recall that.

7            Q.    Okay.  So you had 25 days

8    off, plus 11 and a half, plus 11

9    vacation, plus sick time, right?

10                 How many days of sick time

11   did you get?

12           A.    Five days -- oh, no.  That

13   sick time was I think included in the 15

14   days.

15           Q.    Okay.  Let's assume --

16           A.    I think.

17           Q.    I think -- let's assume

18   that's right.

19                 MR. GOLDBLUM:  No?

20   BY MR. GOLDBLUM:

21           Q.    Okay.  Let's assume it's not

22   right.

23           A.    I'm not sure.

24           Q.    Just so we're clear -- I

Barbara Kurzmann Palinkas

1    proven.  It was time off I had approved

2    by Suzanne Rush to extend the lunch to go

3    to Fox Chase because it took a little

4    longer.

5           Q.    No, I get that.

6                 My question is, why do you

7    think the bank singled you out?

8           A.    I think the bank singled me

9    out because I kept questioning this

10   policy about no pay time off.

11          Q.    When is the first time you

12   ever questioned that policy?

13          A.    Years ago.  It all started I

14   think like '14 when Linda took over.

15          Q.    You're telling me in 2014

16   you questioned that policy, the paid time

17   off policy?

18          A.    When I had to ask for extra

19   time off, I never had a problem with the

20   former president.

21          Q.    That's okay.

22          A.    And then I started

23   questioning it, yes.

24          Q.    Okay.  So let's take -- when

Barbara Kurzmann Palinkas

```
1     did Linda Roehner become president?

2              A.     I believe '14.

3              Q.     Okay.  So you're saying in

4     '14 you questioned the policy?

5              A.     Yes.

6              Q.     Okay.

7              A.     Why --

8              Q.     And were you -- were you

9     disciplined in any way for questioning

10    the policy?

11             A.     Not at that time.

12             Q.     Okay.  So let me -- when is

13    the first time you recall questioning the

14    PTO policy with Linda Roehner?

15                    MR. MANSOUR:  Objection to

16             form.

17                    MR. GOLDBLUM:  Sure.

18    BY MR. GOLDBLUM:

19             Q.     Go ahead.  You can answer.

20                    You said you started in '14

21    questioning the policy.  What do you

22    recall about the first time?

23             A.     I recall that I was afraid

24    of having a day off if I got sick and
```

Barbara Kurzmann Palinkas

1    losing my job.  So I said, you know, why

2    do we have to have days off and get -- be

3    worried about getting sick or having

4    surgery and getting fired.

5              That's the way it was

6    questioned.  It wasn't like I was like

7    questioning, oh, it says this.  It was

8    everything that came from them how I

9    questioned, and I don't believe they

10   liked that I was questioning them.

11        Q.    Okay.  So -- okay.

12        A.    I don't remember exact

13   words, if that's what you're looking for.

14        Q.    I'm trying to find out --

15   you just said that you believe you were

16   singled out for questioning these

17   policies, so I want to try and find out

18   when you began and how often you

19   questioned these policies.

20              You said you started in 2014

21   questioning the policy.  Was it in

22   person, was it in writing?

23        A.    No.  It wasn't --

24        Q.    That was a bad question.

Barbara Kurzmann Palinkas

```
1              A.      It wasn't in writing.  It
2     was verbally, yes, and it was -- it was
3     informal where we -- I would go down once
4     a week on a Friday and I would go in and
5     talk to Linda and things would come up
6     about that time off.
7              Q.      Okay.
8              A.      So --
9              Q.      And was Linda your mentor?
10             A.      My mentor?
11             Q.      Yeah.
12             A.      Maybe in 2012 --
13             Q.      Okay.
14             A.      -- '11, I don't know, '10.
15    I used to look up to her and learn from
16    her.
17             Q.      Okay.  And in 2014 she
18    became the president of the bank?
19             A.      Correct.
20             Q.      Okay.  And do you feel it's
21    inappropriate for her as the president of
22    the bank to speak to her employees about
23    how much paid time off they've used and
24    have left?
```

Barbara  Kurzmann  Palinkas

```
 1          A.    No.
 2          Q.    Okay.  So you said 2014 you
 3   began to question this policy.
 4                Did you ever put anything in
 5   writing about the policy that you recall,
 6   about your issues with the policy?
 7          A.    Not that I recall, no.
 8          Q.    Okay.  Prior to meeting with
 9   Frank Jarrett that we'll talk about, did
10   you ever go to the board about the
11   policy?
12          A.    No, but I did request a
13   meeting with the board and --
14          Q.    I know.  We're going to get
15   to that.
16                But prior to the termination
17   date, you never went to the board about
18   your issues with this policy, right?
19          A.    No.
20          Q.    Did you ever go to human
21   resources?
22          A.    No.
23          Q.    And you never put it in
24   writing to anyone?
```

Barbara Kurzmann Palinkas

```
1           A.    No.
2           Q.    Okay.  I just want to be
3    clear.
4                 Are you aware that there's a
5    policy that you have to take a mandatory
6    one week off consecutively at the bank?
7           A.    Yes.
8           Q.    Okay.  Do you know the
9    reason for that policy?
10          A.    No.
11          Q.    Okay.  Did you follow that
12   policy?
13          A.    Yes.
14          Q.    Okay.  So if you got an
15   e-mail from Tina Heiser that said -- for
16   example, you got an e-mail on July 22nd
17   of 2016 that said, as of today, you're
18   officially out of vacation and paid time
19   off.  You reached the no pay status.
20   It's imperative I bring this to your
21   attention, et cetera.
22                Would you consider that
23   harassment?
24          A.    No.  Not that time, no.
```

Barbara Kurzmann Palinkas

1    leave of absence.

2         Q.    Okay.

3         A.    And you know what the

4    response was.

5         Q.    Right.  But you didn't ask

6    for a specific I need a leave of absence

7    for a certain amount of time, did you?

8         A.    No, I did not because I

9    wasn't sure if I needed it, how long I

10   needed it.

11        Q.    Okay.  Do you recall on

12   August 12th receiving the conduct

13   probation memo, that it was a memo and it

14   had several pages and it listed issues

15   that management had been having with you?

16             Do you recall that?

17        A.    Yes, I recall that.

18        Q.    How is it that you received

19   it?  Did someone hand it to you?

20        A.    They called me in for a

21   meeting with Suzanne Rush, Linda Roehner,

22   John Douglass.

23        Q.    Okay.  So you were called in

24   for a meeting with Linda Roehner, Suzanne

Barbara Kurzmann Palinkas

```
 1      what?
 2             A.    And so I called Linda
 3      personally on my way back to the
 4      Warminster branch and I asked her what
 5      was going on, why was I having to be
 6      transferred, and her answer to me was,
 7      why don't you write a letter saying why
 8      I'm an asset to the bank and leave out
 9      that I want a meeting with the board of
10      directors.  Exact words.  I remember it
11      like yesterday.  And I was like okay.
12                   I never wrote the letter.  I
13      got -- I went on Monday to my branch.  I
14      got an e-mail from John.
15             Q.    Hold on.
16             A.    I know.  I'm going so fast.
17             Q.    I want to take these one day
18      at a time.
19             A.    Okay.  Go ahead.
20             Q.    We're just talking about
21      Friday, August 12th with the probation
22      memo.
23             A.    Okay.  Go ahead.
24             Q.    Was there anything else --
```

Barbara Kurzmann Palinkas

```
 1     some of the things that you just said a
 2     moment ago there.
 3                 Is this the memo that was
 4     handed to you on August the 12th?
 5          A.    It looks like it.
 6          Q.    Do you have any reason to
 7     suspect it's not?
 8          A.    You did give me the wrong
 9     policy revised.
10                 No, I think it is.
11          Q.    Is it the memo or is it not
12     the memo?
13          A.    It looks like the memo.
14          Q.    There's handwriting on here
15     that says, Barb took the original to
16     review and then refused to sign.
17                 Is that right that you
18     refused to sign it?
19          A.    I did.  I did not believe
20     any of it.
21          Q.    Okay.  You did not believe
22     any of it, meaning what?
23          A.    The extended lunch breaks,
24     the out-of-the-office errands.  Anything
```

Barbara Kurzmann Palinkas

```
 1          A.    She told me that Mary was
 2    going out for surgery.  Kim was going to
 3    be out trying to bring in business and I
 4    was the only one that could learn her
 5    desk to do it while Mary was out.
 6          Q.    And you're saying she said
 7    that at the same meeting?
 8          A.    She did.
 9          Q.    Okay.  So the memo itself
10    says you were being placed on a 90-day
11    conduct probationary period.
12                In any event, you weren't
13    being terminated, were you?
14          A.    Not at the time.
15          Q.    Okay.  And you testified
16    earlier that it was within the bank's
17    purview to transfer an employee to a
18    different branch, correct?
19          A.    Yes.
20          Q.    And that if they determined
21    someone needed retraining, that was
22    something that was within their right,
23    right --
24          A.    Yes.
```

Barbara Kurzmann Palinkas

1    weeks before.

2              Q.    Okay.  But you don't know?

3              A.    I don't know exactly, no.

4              Q.    Could it have been longer?

5              A.    I don't think it was too

6    much longer before that, but it was --

7              Q.    Do you think it was in July?

8                    The meeting was August 12th.

9    Do you think she spent two weeks?

10             A.    It could have been about a

11   month before.  It could have been.

12             Q.    But you don't know the date?

13             A.    I don't know the exact date.

14             Q.    Okay.  So what you said then

15   is after you left the meeting, you then

16   called Linda on your way back to the

17   Warrington branch; is that right?

18             A.    To the Warminster branch.

19             Q.    Pardon me.  Thank you.

20   Excuse me.  The Warminster branch.

21                   You called her on the

22   telephone, right?

23             A.    Yes.

24             Q.    And your testimony,

Barbara Kurzmann Palinkas

1    although -- you said, you know, what's

2    going on, but what did you say to her?

3         A.    We would talk just like --

4    you know, I said exactly that.  What's

5    going on?  Why are you transferring me?

6    He's saying one thing.  You're saying

7    another.  And her response was, why don't

8    you write a letter of why you're an asset

9    at the bank --

10        Q.    Okay.

11        A.    -- after 18 years and then

12   leave -- leave out you want a meeting

13   with the board.

14        Q.    Okay.  What would be wrong

15   with writing that letter and saying why

16   you're an asset?

17        A.    I think everything's wrong

18   with that after service of 18 years with

19   the bank and mostly all good years except

20   for the last few they're trying to

21   couple.

22        Q.    Except for the last few

23   years is a problem.

24        A.    No, not few.  Couple.

Barbara Kurzmann Palinkas

1    spoke to him that weekend about it?

2         A.    I'm not certain, but I would

3    think I might have.

4         Q.    Did you speak to any

5    co-workers about it?

6         A.    No, not that I recall.  No,

7    nobody.

8         Q.    So the only person you may

9    have spoken to between August 12th and

10   the 15th is your fiance?

11        A.    Correct.

12        Q.    Okay.  So then it's Monday,

13   August 15th now.  We get to Monday.  And

14   is it correct that you informed Suzanne

15   Rush that you were not able to perform at

16   the main office because it would have

17   been too stressful?

18        A.    Yes.

19        Q.    Okay.  And when did you

20   inform her of that?

21        A.    I'm not sure.  It might have

22   been Tuesday when I reported there.

23        Q.    Okay.

24        A.    I was only there one day

Barbara Kurzmann Palinkas

1    when they started to train me.

2            Q.    Okay.  So right now we're on

3    Monday, the 15th.  Did you have meeting

4    with Linda Roehner and John Douglass on

5    Monday, the 15th?

6            A.    I don't believe so.  I think

7    that's when I got the e-mail from John

8    saying to report on Tuesday.  I don't

9    recall a meeting Monday.

10           Q.    Okay.  So when do you

11   believe your next meeting with Linda and

12   Doug was?

13           A.    After I talked to Mr.

14   Jarrett, the day after.  The next

15   morning.

16           Q.    Okay.  So that would have

17   been Tuesday, the 16th after you had

18   reported to the Hatboro branch; is that

19   right?

20           A.    Wednesday, the 17th, I

21   think.

22           Q.    Okay.

23           A.    Yeah.

24           Q.    Just so we get the timeline

Barbara Kurzmann Palinkas

```
1    remember.  It was not late if that's
2    what...
3            Q.    No.  I didn't know if it was
4    the morning or the afternoon?
5            A.    Yeah, it was the morning.
6            Q.    Okay.  So at opening time?
7            A.    Yes.
8            Q.    Okay.  Are you aware that
9    Suzanne Rush reported that you weren't
10   performing tasks as asked?
11           A.    I was, and I was very
12   shocked about that being the fact I was
13   there one day and they didn't even train
14   me yet on any of the stuff they started
15   to train me on Mary's desk and then I was
16   fired the next day.  I didn't even have a
17   chance to perform any duties there
18   because I wasn't even trained yet.
19           Q.    Do you know what Suzanne
20   believed you were not doing?
21           A.    That I do not know.
22           Q.    Okay.
23           A.    That surprised me.
24           Q.    Do you know what morning
```

Barbara Kurzmann Palinkas

```
1            A.      Bucks County.  I think
2    that's what they were called at the time.
3    I'm not...
4            Q.      And did you work at Joe's
5    Pizza?
6            A.      No, I did not.
7            Q.      You formerly worked there?
8            A.      Long, long time ago.
9            Q.      Okay.
10           A.      Thirty years ago.
11           Q.      So she was concerned about
12   you possibly bad-mouthing the bank at the
13   chamber and she said -- mentioned the
14   chamber of commerce and Joe's Pizza?
15           A.      I believe so, yes.
16           Q.      And what did you say in
17   response?
18           A.      Why would I, because they're
19   not the board of directors, but anybody
20   can bad-mouth in any public place if they
21   want to.  I'm pretty sure that's what I
22   said to her, that anybody could.
23           Q.      When you say anyone can
24   bad-mouth in any public place, what do
```

Barbara Kurzmann Palinkas

```
 1            Q.    Okay.  You were obviously
 2    going through issues with breast cancer
 3    in and August of -- I'm sorry, in and
 4    around August of '16 when you were
 5    terminated, right, obviously?  We've
 6    talked about that.
 7            A.    Correct.
 8            Q.    When did -- you don't know
 9    when that began?
10            A.    It was not breast cancer.
11    It was precancerous tumors.
12            Q.    Okay.  So at all times --
13    forgive my lack of the terminology.
14            At all times you've been
15    dealing with cancer in your breast area,
16    you didn't have breast cancer.  It was
17    pre-cancerous?
18            A.    Right.  I was not diagnosed
19    with breast cancer.
20            Q.    Okay.  I got you.
21            So you were not diagnosed
22    with breast cancer, but you've been
23    dealing with --
24            A.    Many surgeries and
```

Barbara Kurzmann Palinkas

```
 1    stressful.
 2            Q.    But you've been dealing with
 3    lumps in your breasts that have been
 4    removed or --
 5            A.    I had a couple removed.
 6            Q.    Okay.  When did that begin?
 7    Like when was the first time you had
 8    lumps in your breasts that were actually
 9    removed?
10            A.    I think it was 2012 when
11    Joseph Tryon was president and I think
12    that was the first time he gave me time
13    to take off, extra time.  I believe it
14    was 2012.
15            Q.    Okay.  And since that time
16    has it been pretty constant?
17            A.    Yeah.
18            Q.    So how many -- were there
19    other times that you had to have lumps in
20    your breasts removed?
21            A.    Yeah.  I've had two -- I
22    believe two surgeries of them being
23    removed and one surgery for
24    reconstruction and then I had another one
```